IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL ACTION NO. |
| v. | 1:18-cr-00260-LMM-CMS-1 |
| ANTHONY RONDEL BLAIR, | |
| Defendant. | |

## NON-FINAL REPORT AND RECOMMENDATION AND ORDER DENYING MOTION FOR FRANKS HEARING

This matter is before the Court on Defendant Anthony Rondel Blair's Motion to Suppress Evidence Pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), in which Blair seeks to suppress evidence obtained from his cell phone pursuant to a search warrant. [Doc. 161]. For the reasons that follow, I will deny his request for an evidentiary hearing and recommend that his motion to suppress be denied.

### I.   THE CELL PHONE WARRANT

On February 6, 2018, Homeland Security Investigations Special Agent Roy C. Rutherford presented United States Magistrate Judge John K. Larkins III with an application for a search warrant for an iPhone 10 that had been seized from Blair the previous day upon Blair's arrest. [Doc. 223-1 at 1]. Special Agent Rutherford also presented an affidavit in support of the application. [*Id.* at 3–17 ("Rutherford Aff.")].

In his affidavit, Special Agent Rutherford stated that Blair was arrested on February 5, 2018, at the airport in Atlanta, Georgia, based on law enforcement's

belief that he had conspired with other individuals to import cocaine into the United States from Costa Rica. [Rutherford Aff. ¶ 22]. According to the affidavit, on February 5, 2018, Customs and Border Patrol ("CBP") officers in Miami detained three individuals who were travelling together—Shedarian Pearson, Summer Swartz, and Sequoya Quixote—after they arrived at the Miami International Airport from Liberia, Costa Rica. [*Id.* ¶ 10]. The affidavit relates that Miami CBP officers stopped them based on a 2017 "narcotics lookout" for Quixote, who had a previous drug trafficking arrest and conviction. [*Id.*; Doc. 254 at 16]. After the three individuals claimed ownership of their luggage, CBP officers searched their luggage and found cocaine concealed inside food cans (labeled sliced pineapple and Italian tomatoes) in the checked luggage claimed by Quixote and Swartz.[1] [Rutherford Aff. ¶¶ 11, 18]. According to the affidavit, the officers located approximately five kilograms each in Quixote's and Swartz's suitcases. [*Id.*]. Swartz, Pearson, and Quixote were subsequently taken into custody by the Miami CBP officers. [*Id.* ¶ 12].

According to the affidavit, Pearson, Swartz, and Quixote waived their *Miranda* rights and made recorded statements. [Rutherford Aff. ¶ 12]. In his

---

[1] The affidavit states that Quixote told the agents that because Pearson was traveling only with carry-on luggage, she was not given any "souvenirs" to transport. [Rutherford Aff. ¶ 18].

affidavit, Special Agent Rutherford, who was in Atlanta at the time and was not present during the interviews, recounted certain facts from those interviews.[2] In the affidavit, Rutherford attributes the following statements to the various travelers:

**Rutherford averred that Swartz stated**:

- Blair had recruited her to bring back "souvenirs" from Costa Rica.

- Blair said he was a travel agent and offered to pay for her entire trip—airfare, resort fee, and a per diem.

- The only requirement Blair had was that Swartz needed to bring "souvenirs" for him back to the United States.

- She had never met Blair in person but had spoken with him several times over FaceTime.

- She and the other two travelers stayed at the Crowne Plaza in College Park, Georgia on the night before they traveled to Costa Rica, and Blair paid for the hotel.

- Blair would be waiting for the travelers to arrive into Atlanta from Miami on their connecting flight, and he was going to retrieve the souvenirs at that time.

[Rutherford Aff. ¶¶ 13, 19].

---

[2] I provide great detail here about what Rutherford included in his affidavit from interviews because what the travelers said during their interviews is the focus of Blair's motion to suppress.

**<u>Rutherford averred that Pearson stated</u>**:

- She had met Blair in person through her friend Quixote. Quixote told her that someone named Frenchie owed Quixote a trip and had Blair set it up.

- Blair made all of the arrangements for the trip and paid for her travel and stay in Costa Rica.

- In exchange, each traveler would be required to fill out a questionnaire concerning their trip.

- Blair paid for Swartz's passport.

- Pearson knew that they would be bringing back something illegal based on the way Blair described what he wanted her and the others to do. She knew that she would be in danger of being arrested.

- Blair told them to contact him when they arrived in Costa Rica at the resort. He told them to be "normal tourists" while at the resort, but on the last day, "someone would be bringing them souvenirs to their hotel room," and that they should not touch the souvenirs. Blair told them not to go out on their last day at the resort.

- Blair told them he would pick them up in Atlanta and that when they arrived in Atlanta, "he would take control of their bags, take the souvenirs out, and then give them back their luggage."

- Before they left for Costa Rica, Blair arrived at the Crowne Plaza Hotel in College Park driving a large black luxury SUV. He paid for her gas and gave her $250 for spending money in Costa Rica.

- Blair told her that he would be waiting for the travelers to arrive into Atlanta from Miami on their connecting flight, and he was going to retrieve the souvenirs at that time.

[Rutherford Aff. ¶¶ 14–17, 19].

**Rutherford averred that Quixote stated**:

- Blair told him he (Blair) was a travel agent.

- He had seen Blair only once, via FaceTime.

- On the last day of the trip, a Dominican man who spoke English arrived at their hotel room, unpacked the luggage and inserted the "souvenirs."

- The man took a picture of the luggage and told them that the way the luggage was packed at the time is the way it should arrive at the United States.

[Rutherford Aff. ¶ 18].

Swartz, Pearson, and Quixote did not board their flight to Atlanta, but instead stayed in Miami. [Rutherford Aff. ¶ 20]. At the agents' instruction, Swartz texted Blair at the time that their flight was scheduled to land and told him that the three travelers had arrived in Atlanta safely. [*Id.*]. Blair and Swartz then exchanged text messages regarding the time and location at the airport that Blair would pick them up. [*Id.*]. Blair then called Swartz, told her that he had arrived to pick them up at the airport and that he was in a "large black car" outside of B6. [*Id.* ¶¶ 20, 21].

Meanwhile, law enforcement officers in Atlanta were on the lookout for Blair, and they observed a black 2017 Chevrolet Suburban park near B6. [Rutherford Aff.

5

¶ 21]. Law enforcement conducted a traffic stop of the Suburban, which Blair was driving. [*Id.* ¶ 22]. Law enforcement took Blair into custody and confiscated a large amount of cash; they also seized Blair's cell phone at that time. [*Id.*]. After the agents had possession of the phone, they had Swartz send a text message to Blair asking, "Where are you?" to confirm that the confiscated cell phone was the same phone that was being used to communicate with Swartz, Pearson, and Quixote about being picked up at the airport. [*Id.* ¶ 23]. The message appeared on the phone. [*Id.*].

Based on this information, Special Agent Rutherford sought a warrant to search the contents of the phone. Judge Larkins signed the warrant on February 6, 2018, authorizing the agents to search the phone for records relating to drug trafficking and drug importation. [Doc. 223-2].

## II.  BLAIR'S MOTION TO SUPPRESS

Blair argues that Special Agent Rutherford made a misrepresentation of a material fact and omitted several material facts from his affidavit. All of the points of contention relate to discrepancies between what Agent Rutherford said the three travelers told the Miami CBP agents during their interviews, and what the recordings of the interviews—recordings that were later produced during discovery—reflect was actually said. Blair demands a *Franks* hearing to support a motion to suppress based on the discrepancies. [Doc. 161 at 5].

In particular, Blair points to the following statements that the travelers made during their interviews that were not included in the affidavit:

- During her interview, Swartz stated that Blair told her that he was not going to touch her stuff and that "I get to keep everything, all the souvenirs." She told the agents that Blair "kept reassuring me that nothing was gonna happen, that I get to keep everything, whatever they put in the bag I would get to keep." Swartz told the agents that Blair told her "I just need you to fill out this questionnaire and you can go about your business."

- Pearson stated that the man who packed the souvenirs in their luggage in Costa Rica told her that "everything" she was taking was hers. During her interview, Pearson stated that when she told the man who packed the souvenirs in her luggage that Blair intended to take the souvenirs, the man said "I don't know why he said that. Everything you're taking is yours."

- During his interview, Quixote played a phone recording of a telephone conversation between him and Blair in which Blair stated, "everything you basically get, you get a chance to keep."

- Quixote told the agents that the Dominican man told him he ran a "luggage security business," that the travelers were receiving "free souvenirs for you guys to take home," and that the purpose of the trip was to "make sure that it [the luggage] makes it to your final destination like this. We're gonna make sure nothing was taken out, tampered with . . . ."

- Quixote told the agents that Blair told Quixote that Blair would check Quixote's luggage upon Quixote's return to the United States to ensure that none of Quixote's luggage, including the souvenirs, had been tampered with by Customs or other airport personnel.

[Doc. 161 at 2–4; Doc. 225 at 2].

7

Blair also asserts that the following statement in Rutherford's affidavit is a material misrepresentation of what was actually said during the interviews: "Swartz and Pearson stated that Blair was going to meet them at the airport in Atlanta, at which time he would take the bags containing the souvenirs, and retrieve the souvenirs." [Doc. 161 at 2–3 (citing Rutherford Aff. ¶ 19)]. According to Blair, this statement is inaccurate for two reasons. First, he asserts that Swartz never explicitly stated that Blair told her he would take possession of the souvenirs. [Doc. 161 at 3]. And, second, Pearson never stated that she directly communicated with Blair regarding the souvenirs, much less that Blair gave her detailed instructions indicating that he would take possession of them. Rather, Pearson told law enforcement during her interview that she heard about the instructions from Swartz and through overhearing telephone conversations.[3]  [*Id.* at 3].

---

[3] The Government does not dispute that this statement is inaccurate, but it argues that Blair has failed to offer any proof that Special Agent Rutherford acted intentionally, deliberately, or recklessly in making the statement. The Government argues that Blair's motion can be denied on this basis as well. [Doc. 223 at 3–5]. The Government points out that Special Agent Rutherford (who was in Atlanta) did not actually interview the three travelers. By way of proffer, the Government states that at the time the affidavit was submitted—less than 24 hours after the interviews took place—the interviews had not been fully documented, and Rutherford had not reviewed a complete copy of the recorded interviews. [*Id.*]. In his reply brief, Blair contends that Special Agent Rutherford should be held accountable for this misrepresentation because during the preliminary hearing, Rutherford admitted to having "direct contact" and "discussions" with both Pearson and Swartz while they were in Miami. [Doc. 225 at 3–4]. Because the facts about which Blair complains are so clearly not material to the probable cause finding, I have not addressed

According to Blair, the affidavit mischaracterizes the travelers' statements "to create a narrative that Mr. Blair 'recruited' these individuals and specifically instructed them to retrieve 'souvenirs' for him from Costa Rica." [Doc. 161 at 5–6]. Blair alleges that the omitted and misrepresented facts "cut against the affidavit's statement of probable cause." [*Id.* at 6; Doc. 225 at 2]. Blair argues that "there can be no probable cause to believe Mr. Blair recruited individuals to import drugs from Costa Rica if there was no plan for him to take possession of the alleged drugs upon their return." [Doc. 225 at 5].

### III. DISCUSSION

Affidavits supporting search warrants are presumptively valid. *Franks*, 438 U.S. at 171. "Thus, a defendant is generally not entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a search warrant affidavit." *United States v. Price*, 582 F. App'x 846, 850 (11th Cir. 2014). Rather, to be entitled to an evidentiary hearing on a motion to suppress based on alleged omissions or misrepresentations in a search warrant affidavit, a defendant must make "a substantial preliminary showing" that the omitted facts, if included, would have prevented a finding of probable cause. *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009).

---

whether Blair has made a sufficient showing on the issue of Special Agent Rutherford's intent.

In reviewing search warrants, courts are not to "interpret supporting affidavits in a hyper-technical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994)); *see also United States v. Robinson*, 62 F.3d 1325, 1331 (11th Cir. 1995) (requiring the reviewer to afford "great deference" to a judicial determination of probable cause). If, after removing the misrepresentations and including the material that the defendant claims was improperly omitted from the affidavit, "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171–72. Insignificant or immaterial misrepresentations or omissions will not invalidate a warrant. *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).

Even when taking into account the omitted facts and disregarding the alleged misrepresentations, the facts contained in Special Agent Rutherford's affidavit are more than sufficient to support a finding of probable cause. *Franks*, 438 U.S. at 171–72; *Kapordelis*, 569 F.3d at 1309. The totality of the circumstances overwhelmingly supports a finding of probable cause to believe that Blair's phone would contain evidence of a crime. The facts reflect that Blair organized and paid

10

for the trip; that he arranged for someone (alleged to be co-defendant Arias) to bring the cans containing cocaine to the travelers' hotel and pack them in their luggage on the last day of the trip; that the travelers were instructed not to touch the "souvenirs" or leave the resort after receiving them; that the cans in the travelers' luggage contained large amounts of cocaine; that Blair arranged for the travelers to be picked up at the airport; that Blair actually arrived at the airport to pick them up; and that Blair used his cell phone to communicate with the travelers.  Even if one or more of the travelers was told that they could keep some or all of the items they were transporting, there was still ample probable cause to believe that the phone would contain evidence that Blair conspired to import and distribute a controlled substance in violation of 21 U.S.C. § 952, § 960, § 963, § 841, and § 846.  And even if Blair did not tell the travelers that he planned to retrieve the cans from their luggage, common sense dictates that Blair—who paid for and organized the trip—intended to retrieve the cans at some point, especially because he arrived at the airport to pick them up.[4]  As the Government points out, common sense dictates that drug

---

[4] Moreover, the drug conspiracy statutes with which Blair has been charged (21 U.S.C. § 846 and § 963) do not require proof that Blair intended to personally take possession of the cocaine. *See United States v. Shabani*, 513 U.S. 10, 15–16 (1994) ("In order to establish a violation of 21 U.S.C. § 846, the Government need not prove the commission of any overt acts in furtherance of the conspiracy."). It is sufficient that Blair organized the transportation of the cocaine into the United States. *United States v. Harriston*, 329 F.3d 779, 783 (11th Cir. 2003) (noting that "the

traffickers are not so generous as to organize free vacations for travelers and then allow them to keep hundreds of thousands of dollars of illicit drugs after the drugs have been successfully transported back into the country. Thus, the alleged omissions and misrepresentations are not material and therefore do not entitle Blair to a *Franks* hearing. *United States v. Reid*, 69 F.3d 1109, 1114 (11th Cir. 1995).

The facts about which Blair complains in his motion are not material to Judge Larkins's "practical, common-sense decision" that, given all the circumstances set forth in the affidavit, there was a fair probability that evidence of a drug trafficking crime would be found in Blair's cell phone. *Illinois v. Gates*, 462 U.S. 213, 214 (1983). As such, Blair is not entitled to a hearing, and the motion to suppress should be denied. *See Franks*, 438 U.S. at 171–72; *United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009).

---

government is not required to prove an overt act for . . . a drug conspiracy"). Rutherford's affidavit contained ample evidence of that organization.

## IV.   CONCLUSION

For the foregoing reasons, I **DENY** Blair's request for an evidentiary hearing and **RECOMMEND** that Blair's Motion to Suppress Evidence Pursuant to *Franks v. Delaware* [Doc. 161] be **DENIED**.

This 5th day of May, 2021.

_____
CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE