IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ANTHONY RONDEL BLAIR,

        Defendant.

CRIMINAL ACTION NO.

1:18-cr-00260-LMM-CMS-1

## FINAL REPORT AND RECOMMENDATION

This matter is before the Court on three motions to suppress filed by Defendant Anthony Rondel Blair. [Docs. 33, 44, 45]. In his first motion, Blair argues that evidence obtained from his cell phone following his arrest on February 5, 2018 should be suppressed because (1) there was no probable cause for the arrest; and (2) the agents manipulated the phone before they obtained a warrant. [Doc. 33]. In his second motion, Blair argues that identification evidence from two witnesses should be suppressed because the procedures the Government employed were overly suggestive and the identifications were not reliable. [Doc. 44]. In his third motion, Blair argues that evidence obtained from his cell phone following his arrest on June 10, 2018 should be suppressed because (1) there was no probable cause for the arrest; and (2) the agents illegally seized the phone from his car without a warrant. [Doc. 45]. For the reasons that follow, I will recommend that each of these motions be denied.

# I.     FACTS PRESENTED AT THE EVIDENTIARY HEARING

I held an evidentiary hearing on October 21, 2020, and a transcript was prepared.  [Doc. 254 ("Tr.")].  At the hearing, the Government presented the testimony of two special agents from Homeland Security Investigations ("HSI")—Special Agent Jorge De Cardona via Zoom from Miami, and Special Agent Roy Rutherford who testified in person in Atlanta.

## A. <u>The February 2018 Arrest and Identification of Blair</u>

The testimony showed that on February 5, 2018, Customs and Border Protection ("CBP") officers at the Miami International Airport in Miami, Florida, detained three airline passengers—Summer Swartz, Shadarion Pearson, and Sequoya Quixote—who arrived from Liberia, Costa Rica on their way to Atlanta. [Tr. at 15–16, 24, 88].  Agent Rutherford testified that the passengers were selected for additional screening because Quixote had a previous drug trafficking arrest and the three were traveling together from a country known to be a common source of drugs.  [*Id.* at 16–17].  The inspection of Quixote's and Swartz's suitcases revealed cocaine hidden in cans that were labeled as containing pineapple and tomatoes.  [*Id.* at 17–18, 88].  CBP officers took all three passengers into custody.  [*Id.* at 17–18].

At the Miami airport, HSI Agents De Cardona and Mark Lopez interviewed each of the three passengers individually.  [Tr. at 18, 88, 96].  At the evidentiary

hearing, the recordings of the interviews with Swartz and Pearson were admitted into evidence. [Doc. 298 (Gov. Exs. 2, 3)].

Swartz was interviewed first. At the very beginning of her interview—before any questions were asked—Swartz stated that the person "in control of everything," the "bad guy," was Anthony Blair, and that Blair was supposed to pick her up in Atlanta that evening. [Gov. Ex. 2 at 4:22–5:04]. Swartz told the agents that her friend and traveling companion, Quixote, had approached her about taking an expense-paid vacation to Costa Rica, and she agreed to go. [Tr. at 16; Gov. Ex. 2 at 11:35, 22:45, 47:41–48:00]. She told the agents that after she agreed to take the trip, Blair contacted her and claimed to be a travel agent. [Gov. Ex. 2 at 13:55]. She said that Blair coordinated the trip and sent her $250 via Cash App so she would have money "to eat off of." [Tr. at 19, 21; Gov. Ex. 2 at 14:02, 34:40–34:50]. Swartz told the agents that Blair paid for her airfare and hotel. [Tr. at 19, 21; Gov. Ex. 2 at 14:20–14:30]. Additionally, she said that Blair provided her a room at the Crown Plaza hotel the night before her flight departed. [Tr. at 19, 21; Gov. Ex. 2 at 51:10–52:15]. Swartz told the agents that before the trip, Blair had asked her for a photo of the suitcase she intended to take on the trip. When she sent him a photo of the bag, Blair advised her that she needed something bigger, and he dropped off a bigger suitcase for her at the hotel, which she used as her checked luggage for trip. [Tr. at 19; Gov. Ex. 2 at 49:50–51:10].

3

During the interview, Swartz said that Blair told her and the other passengers that the purpose of the trip was to bring back souvenirs and to fill out a survey. [Tr. at 20; Gov. Ex. 2 at 54:50–55:15]. Swartz also told the agents that Blair told her that when she returned from Costa Rica, Blair would meet her at the Park and Ride. Once they met there, she would fill out a questionnaire for his travel agency, and he would ask her a few questions. She said that he told her that he would not touch any of her stuff, and that she could keep all the souvenirs.[1] [Gov. Ex. 2 at 10:40-10:55, 55:25–56:44, 57:30–57:41].

Swartz told the agents that on the last night of their trip, a Hispanic (possibly Dominican) man with a Boston accent came to her hotel room and brought them a bunch of souvenirs, including shirts, coffee, alcohol, shot glasses, and the pineapple and tomato cans. The man told them, "You can keep everything!" [Gov. Ex. 2 at 30:05–30:15]. The man placed the cans, along with other souvenirs, in Swartz's and Quixote's suitcases. Pearson took some of the souvenirs in her carry-on

---

[1] Blair makes much of this statement in his motion to suppress. At the hearing, Agent Rutherford testified that during an unrecorded phone call after Swartz's recorded statement and before Blair was arrested, Swartz told him that the plan was for Blair to retrieve the souvenirs out of her bag when he picked her up at the airport. [Tr. at 62–68]. It is possible that Swartz's story changed as the evening went on, or that Agent Rutherford was mistaken. For purposes of this Report and Recommendation, however, I am assuming that the only information the officers had at the time of Blair's arrest was the information contained in Swartz's recorded statement, i.e., that Swartz was told she could keep all the souvenirs.

luggage, but did not have any of the cans because she did not have a checked bag. [*Id.* at 30:45–31:15].

Swartz told the agents that she had never met Blair in person because all of their pre-trip coordination was conducted through phone calls, text messages, and FaceTime (a video conference phone call). She thought, however, that she could "recognize him by voice." [Tr. at 20; Gov. Ex. 2 at 5:33, 31:44–31:55]. Swartz stated that she was not sure she could identify Blair by picture because she had only seen him over FaceTime, but she offered to do what she could to assist with catching him. [Gov. Ex. 2 at 31:50–32:02]. Swartz described Blair as a skinny, short-haired Black male with no facial hair who drove a high-end sport utility vehicle ("SUV") and lived in a high-rise building in Atlanta. [Tr. at 22–23; Gov. Ex. 2 at 32:05–34:38]. She also provided the agents with Blair's phone number, which was saved in her recent contacts in her phone. [Tr. at 93; Gov. Ex. 2 at 5:55–6:10].

Agent De Cardona testified that at the end of the interview with Swartz, he contacted agents in Atlanta. [Tr. at 88, 96–97]. In Atlanta, Agent Rutherford decided to proceed with a surveillance operation in the hope of arresting Blair, who was supposed to pick the travelers up at the airport that evening. [*Id.* at 35]. Based on the information gathered from the travelers in Miami, which included Blair's full name, an Atlanta-based HSI agent performed a database search which produced a

photo of Anthony Rondel Blair.  The photo was a color booking photo of Blair from an arrest in North Carolina, and he had long dreadlocks in the photo.  [*Id.* at 23, 70–71; Doc. 296-1 (Gov. Ex. 1)].  Agent Rutherford texted the picture to Agent Lopez in Miami.  [*Id.* at 23, 36, 72].

Agent Lopez showed Swartz and Pearson the booking photo.  [Tr. at 36–37, 89, 93–94].  According to Agent De Cardona, both Swartz and Pearson positively identified the person in the picture as the person that was involved in arranging their trip.  [*Id.*].  These identifications were not recorded.

Agent Rutherford testified that he and the Miami agents determined that there was not enough time to coordinate a controlled delivery in Atlanta before the passengers' connecting flight was scheduled to depart Miami, so the agents decided to keep the three travelers in custody in Miami.  The agents devised a plan in which Swartz (still in custody in Miami) would act as if she had arrived in Atlanta in order to entice Blair to come to the Atlanta airport to pick her up.  [Tr. at 24–26].  Toward that end, Agent Rutherford tracked the would-be connecting flight using a Google search, and he instructed the Miami agents to power off Swartz's phone while that flight was airborne and to turn the phone back on when it landed.  [*Id.* at 25].  In the meantime, Swartz (in Miami) was placed on the phone with Agent Rutherford (in Atlanta), and she was "questioned fairly aggressively about what she was supposed

to do with the souvenirs once she arrived in Atlanta."[2]  [*Id.* at 97–98].  At the time of the flight's arrival in Atlanta, Rutherford—through Agent Lopez—instructed Swartz to contact Blair and tell him that she had arrived and would be waiting for him at a certain door outside the American Airlines baggage claim on the lower level, B6.  [*Id.* at 26].  Swartz provided details to Agent Rutherford about the car that Blair said he would be driving to pick them up—a black SUV—and the exit door (B6) where Blair said he would pick them up.  [*Id.* at 27, 95, 97].

Agent Rutherford testified that he and Officer Levine of the Atlanta Police Department parked near the American Airlines baggage claim in Officer Levine's patrol car to wait for Blair.  [Tr. at 27].  During this time, Blair provided updates to Swartz about his location, until he told her that he had found the location (lower level B6) and that he was outside waiting, stopped in the roadway.  [*Id.*].  At the same time, Agent Rutherford observed a black luxury SUV arrive and stop in the middle of the road in front of the lower level B6 door, away from the curb.  [*Id.* at 26–27].  Agent Rutherford testified that Officer Levine activated the patrol car's emergency equipment to stop the SUV and that both men left the patrol car.  Officer Levine approached the driver's side of the black SUV and Rutherford approached the passenger's side.  [*Id.* at 28].  Agent Rutherford said the driver of the SUV

---

[2] *See* Note 1, *supra*.

appeared to be the same person in the booking photo sent to Miami, except that he was not wearing dreadlocks. [*Id.*; Doc. 300-1 at 3 (Def. Ex. 6)]. When Officer Levine asked for identification, the driver produced a driver's license that identified him as Anthony Rondel Blair. [*Id.* at 28–29]. At some point, Agent Rutherford photographed the driver's license. [*Id.* at 71–72; Doc. 300-1 at 2 (Def. Ex. 5)]. Blair was placed in handcuffs and taken into custody. [*Id.* at 29]. Agent Rutherford and Officer Levine transported Blair to an office at the airport, while Agent Damon Grimley took Blair's vehicle and followed them. [*Id.*].

Later that evening, Pearson gave a recorded statement in which she corroborated many of the details from Swartz's recorded statement. [Gov. Ex. 3]. Pearson told the agents that because she was an entertainer and a dancer, she was accustomed to receiving free trips, but there was something suspicious about this trip. She said she was paranoid the whole time. [*Id.* at 48:00–48:40].

She said that Quixote asked her to go to Costa Rica with him on what he described as a "free trip." He said that a girl named Frenchie owed him money that she was going to pay him back by paying for the trip. [Gov. Ex. 3 at 10:40–12:30]. She said that the trip would be run through a third party named Anthony who "basically sponsored" the trip. [*Id.* at 12:20–12:35, 32:55–32:58]. She and Anthony got in touch with each other by phone and arranged to meet at a Quick

8

Trip so that he could give her $300 cash for food on the trip.  While they were there, he also filled up her gas tank.  [*Id.* at 16:30–17:50].  He also offered her a suitcase, which she declined.  [*Id.* at 18:20–18:40].  According to Pearson, Blair booked the trip for her.  She sent him a copy of her passport, and he obtained a passport for Swartz.  [*Id.* at 32:30–32:45].

Midway through the interview, Agent Rutherford joined the interview by phone.  [Gov. Ex. 3 at 24:25–24:45].  In response to Agent Rutherford's questions, Pearson stated that Blair had told the travelers that they were not allowed to leave the hotel on the last day of their trip because he was sending someone to drop off the souvenirs.  [*Id.* at 25:45–26:00, 27:40, 42:30–42:33].  She said that the plan was for Blair to pick them up in Atlanta, and that when they got in his car, he would check the bags and take out everything he wanted.  [*Id.* at 28:35–28:40, 28:45–29:04, 50:30–50:40].

Pearson told the agents that after the travelers arrived in Costa Rica, Blair called her to find out her room number, and it made her uncomfortable.  [Gov. Ex. 3 at 46:30–46:42].  Pearson told the agents that on the last day of their trip, a skinny Dominican man had come to their room and packed the suitcases that Swartz and Quixote were taking.  [*Id.* at 36:20–37:30, 43:05–43:30].  The Dominican man told

them that Anthony worked for him as a "middleman" who located people for the trips. [*Id.* at 43:40–44:15].

In terms of the identification, Pearson told the agents that she had gotten a look at Blair from their meeting at the gas station and that he drove a black SUV. [Tr. at 22–23, 37; Gov. Ex. 3 at 47:13–47:20, 56:35–57:26]. During her recorded interview, Pearson was shown the photograph of Blair's driver's license, which was on one of the agent's phones.[3] [Tr. at 89; Doc. 300-1 at 2 (Def. Ex. 5); Gov. Ex. 3 at 57:26–57:37]. Without hesitation, Pearson identified the person in the photograph as "Anthony Blair," the person who she had met at the gas station.[4] [Gov. Ex. 3 at 57:26–58:20].

---

[3] It was not clear who sent the driver's license photo to the Miami agents. Agent Rutherford testified that after he took the picture of Blair's driver's license, he placed it in his file folder and did not send it to the agents in Miami. [Tr. at 71–72]. He testified that the only picture he sent was the booking photo. [*Id.* at 72]. In a previous affidavit, however, Agent Rutherford had averred that Pearson had been shown a Georgia DMV photo of Blair. When asked about this issue, Agent Rutherford said that his statement in the affidavit was not correct because he wrongly believed that the booking photo was actually a DMV photo. [*Id.* at 73].

[4] Six weeks later, on March 13, 2018, Agent Rutherford interviewed Swartz again, at which time she picked Blair out of a six-photo array. Blair offered three videos relating to this identification into evidence, but he has not challenged the admissibility of that identification. [Doc. 299 (Def. Ex. 7)].

## B. **Blair's iPhone**

While transporting Blair's vehicle to the office at the airport, Agent Grimley discovered a cellphone in the center console of the SUV.  Upon learning about the phone, Agent Rutherford told Agent Grimley to "grab that cellphone and bring it in when we bring Blair into our office."  [Tr. at 30].

Agent Rutherford testified that upon arrival to his office, he took the handcuffs off  Blair and read Blair his *Miranda* rights.  He asked Blair if he would like to waive his rights and provide a voluntary statement, and Blair declined.  [Tr. at 30].  Agent Rutherford then asked for consent to search the cellphone, an iPhone 10, and Blair refused consent.  [*Id.* at 30–31].  Agent Rutherford testified that at that point, he instructed Swartz (through Agent Lopez in Miami) to send Blair a text message.  [*Id.* at 31].  She complied, at which point the agents in Atlanta observed a notification appear on Blair's phone's lock screen with Swartz's phone number on it; the content of the message did not appear.  [*Id.* at 31–32].

Law enforcement then unlocked Blair's iPhone by guessing the passcode, which was Blair's date of birth.  [Tr. at 31, 79].   Agent Rutherford then put the iPhone in "airplane mode" to prevent the phone from receiving any phone calls or other signals, changed the iPhone's settings so it would remain unlocked, and placed it in a Faraday bag.  [*Id.* at 32; 80].  Later, after Blair was transported to jail,

11

Agent Rutherford again accessed the iPhone's settings to identify the phone's identifying information in case it was needed for the search warrant application. [Tr. at 33, 80–81; Doc. 300-1 at 1 (Def. Ex. 4)].

The next day, February 6, 2018, the agents obtained a warrant to search Blair's iPhone.[5]   [Tr. at 40; Doc. 278-1 at 1–4].   The affidavit supporting the application included the fact that the agents had used Swartz's phone to text Blair and cause a notification to appear on the lock screen of Blair's iPhone, but the affidavit did not include any information obtained after the agents unlocked the iPhone.  [Tr. at 33, 81; Doc. 278-1 at 5–23].

Blair was later released on bond, and the charges were dropped.  [Tr. at 42]. Agent Rutherford testified that law enforcement chose not to proceed with the prosecution because they wanted to broaden their investigation and develop a case against Blair's co-conspirators.  [*Id.* at 43].

---

[5] The search warrant for Blair's iPhone 10 that was seized on February 5, 2018 is a subject of a separately-filed motion to suppress in which Blair contends that Agent Rutherford (the affiant) made material misrepresentations and omissions in the affidavit.  [Doc. 161].  I have previously recommended that the district judge deny that motion.  [Doc. 292].

## C. **The Ongoing Investigation**

The search of Blair's iPhone revealed significant inculpatory information concerning the Costa Rica trip that Swartz, Pearson, and Quixote had taken, including photos of the travelers' suitcases and passports, as well as records of phone calls between them and Blair.  Additionally, the cell phone information revealed email communications showing that Blair had made similar Costa Rica trip arrangements for approximately sixty other passengers and that Blair had been in direct communication with a man named Jason Arias, who had been in Costa Rica at the time that Swartz, Pearson, and Quixote were there.[6]  [Tr. at 41, 44].

The phone evidence also revealed that Arias had passed certain names to Blair, including David Barros and Madison Kelleher—two people who had recently been stopped at the airport in Charlotte, North Carolina, on their way to Costa Rica. [Tr. at 45].  Their luggage contained empty cans and different-size lids, and both Barros and Kelleher were traveling with "bulk currency."  The money was seized, but the cans were allowed to travel to Costa Rica.  [*Id.* at 46].  Later, agents learned

---

[6] Jason Arias was indicted along with Blair.  Arias entered a guilty plea on August 10, 2020 to Count One (conspiracy to import cocaine into the United States) and Count Seven (conspiracy to commit money laundering) of the Second Superseding Indictment.  [Doc. 244; Doc. 244-1 at 1].

13

that Jason Arias and David Barros were cousins and that Arias was originally scheduled to be on the same flight as Barros and Kelleher. [*Id.* at 46–47].

### D. __The June 2018 Arrest of Blair__

Agent Rutherford testified that on June 10, 2018, he screened a flight returning to Atlanta from Liberia, Costa Rica. [Tr. at 51]. A passenger named Michelle Rosa was found to be carrying five cans labeled as containing pineapple or tomatoes that were filled with a paste that tested positive for cocaine hydrochloride. [*Id.* at 52]. Agent Rutherford noted the similarities between the circumstances of Rosa's illegal activity and that of Swartz, Pearson, and Quixote a few months earlier. After waiving her *Miranda* rights, Rosa gave a voluntary statement.

Rosa told Agent Rutherford that a cousin had arranged a trip to Costa Rica for her. The trip was paid for via Cash App payments to her from someone she did not know. [Tr. at 52]. On her last night in Costa Rica, another cousin, Jason Arias, came to her room and placed souvenirs in her bag. Arias told her "he was trying to see if Customs was attempting to manipulate her bag or if someone was tampering with her bag." [*Id.* at 53]. A third cousin, David Barros, was supposed to meet Rosa at her apartment and collect the cans from her when she returned home. [*Id.*].

14

Agent Rutherford testified that Rosa agreed to cooperate with his investigation and allowed him to access her phone. [*Id.* at 54].

Through Rosa, law enforcement attempted to lure Barros to the airport to pick her up. [Tr. at 55]. After this attempt failed, Agent Rutherford and other members of the strike force narcotics team took Rosa to her apartment and set up surveillance. [*Id.* at 56]. Using Rosa's phone, the officers tried to lure Barros to the apartment. [*Id.* at 56–57]. During this time, Rosa confirmed her address with Barros over the phone. [*Id.* at 58]. Around midnight, an agent who was inside the apartment with Rosa called Agent Rutherford, telling him that someone who Rosa did not know was knocking loudly on the door. Agent Rutherford left his vehicle, went up the stairs to Rosa's apartment, and found Blair knocking on Rosa's door. [*Id.* at 57]. Agent Rutherford took Blair into custody at that time.

According to Agent Rutherford, Blair "acted confused," stating, "Why are you taking me into custody? I'm only coming here to see somebody." [Tr. at 58]. Before giving *Miranda* warnings, Agent Rutherford took Blair into the parking lot and asked him to identify his vehicle, at which point, Blair pointed out a White Jeep Cherokee. [*Id.*]. Rutherford told agents to "open the vehicle and obtain any phones that were located in the general area of where Blair was seated" because he "needed to know who [Blair] was in communication with prior to arriving at Rosa's

residence." [*Id.* at 59].  Agents next had a drug dog sniff the vehicle.  It alerted to the presence of narcotics inside the vehicle.  Rutherford then obtained a search warrant for the vehicle.  [*Id.*].

## II.   MOTION TO SUPPRESS EVIDENCE (February 5 Arrest)

In his first motion, Blair argues that all evidence obtained from his cell phone following the February 5 arrest should be suppressed because (1) the phone was seized pursuant to a "false arrest" on February 5, 2018; and (2) the officers illegally manipulated the phone before obtaining a warrant.  [Doc. 33].  I will address these arguments in turn.

### A. <u>Probable Cause to Arrest Blair on February 5, 2018</u>

Blair first argues that the officers did not have probable cause to arrest him on February 5, 2018, at the Atlanta airport.  In his post-hearing brief, Blair argues that "[w]ithout evidence that Blair intended to take possession of the cocaine from the travelers upon their return, there is no probable cause that Blair intentionally or knowingly imported cocaine."  [Doc. 265 at 14].  Blair argues that the evidence shows that Arias (not Blair) recruited Swartz and the others.  [Doc. 280 at 3].  He focuses on the fact that Swartz stated during her recorded interview that she was told she could keep all of the souvenirs.  Blair argues that there was no probable cause to believe that Blair was involved in anything illegal because: (1) Blair did

not tell the travelers what the souvenirs would be; (2) Blair did not tell the travelers that they would be bringing back anything illegal; (3) Blair did not say that he would retrieve the souvenirs from the travelers upon their return to Atlanta; and (4) Blair told Quixote that he was not doing anything illegal.  [Doc. 265 at 6].  Based on these facts, Blair argues that the evidence shows that he did not know anything about the drugs.

The Government argues that there was probable cause to arrest Blair on suspicion of cocaine trafficking based on "substantial and detailed information provided by Swartz" that tied Blair to the cocaine found in the luggage in Miami. [Doc. 278 at 13].  I agree with the Government.

"The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends upon the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). It is "a flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983).  In evaluating challenges to probable cause, courts consider the officer's knowledge at the time of the arrest, and consider whether the officer had reasonably trustworthy information that "would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to

commit an offense." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (internal quotation marks and citations omitted).

At the time of Blair's arrest, the agents had credible information that Blair planned and paid for Swartz's "free trip," provided Swartz with a suitcase that he preferred over hers, provided details about how the travelers would obtain the "souvenirs," and instructed them that they should not touch their luggage or leave their hotel after receiving the items. The agents knew that cocaine was found in the "souvenirs" in the travelers' luggage. And there was ample evidence that Blair planned to pick the travelers up in Atlanta, including the telephone communications between Blair and Swartz immediately prior to Blair's arrest. Finally, the fact that Blair actually arrived at the agreed-upon time and place to pick them up corroborates all of the information that the travelers provided to the agents. Considering the totality of the circumstances, I easily conclude that the agents in question had a reasonable belief that Blair was actively engaged in drug-related offenses at the time he was arrested and that their belief was based on sufficiently trustworthy information. *See Pringle*, 540 U.S. at 372. This is true even if Blair never told the travelers that they were doing anything illegal or that he was going to take anything out of their bags at the conclusion of the trip.

**B. <u>The Manipulation of Blair's iPhone Without a Warrant</u>**

The day after Blair's February 5 arrest, Agent Rutherford obtained a search warrant for Blair's phone.  Blair argues that the warrant is tainted and that all evidence obtained pursuant to the warrant should be suppressed because the agents illegally caused a notification to appear on Blair's phone without first obtaining a warrant, and then the agents used that information in their search warrant application.  [Doc. 265 at 15].  This argument fails for two independent reasons.

First, the evidence was lawfully obtained.  The Seventh Circuit has held that notifications that automatically appear on the screen—notifications that could have been disabled if the phone's user had chosen to do so—are considered to be in plain view so long as they appear without the officers opening or manipulating the phone. *See, e.g., United States v. Brixen*, 908 F.3d 276, 282 (7th Cir. 2018) (concluding that no search had occurred where an officer sent a Snapchat message to the defendant and then observed a Snapchat notification appear on the defendant's phone).  Here, as discussed above, there was ample probable cause to arrest Blair when he arrived at the Atlanta airport to meet the travelers, and the iPhone was lawfully seized pursuant to his arrest.  I agree with the Seventh Circuit's reasoning in *Brixen* and conclude that the notification of the incoming text message from Swartz was in plain view, and the agents were authorized to use this information in their warrant application.   *See id.* (holding that the defendant "simply had no reasonable

19

expectation of privacy in a conspicuous notification once his phone was seized"). Because the agents did not open or manipulate the phone in order to obtain this evidence, their actions do not amount to a search.  *Id.*

Second, even if the agents acted improperly by sending the text message (which I do not think they did), the cell phone evidence still would be admissible. The Eleventh Circuit instructs that when the Government uses improperly obtained evidence to secure a warrant, the Court should apply a two-part test to determine whether the evidence seized pursuant to the warrant is nonetheless admissible. *United States v. Albury*, 782 F.3d 1285, 1291 (11th Cir. 2015). First, any unlawfully obtained information should be excised from the affidavit and the Court should determine whether the remaining information supports a finding of probable cause. *Id.*  Second, if the remaining information does support a finding of probable cause, the Court should determine whether, as a question of fact, the officers' decision to obtain a warrant was the product of the unlawfully obtained information. *Id.*

I have previously examined the probable-cause basis for the search warrant in my Report and Recommendation dated May 5, 2021.  [Doc. 292].  I concluded that the search warrant application for the iPhone contained ample evidence to establish probable cause to believe that evidence of a crime would be found on the iPhone.  [*Id.* at 10–11].  I reviewed the evidence as follows:

> The totality of the circumstances overwhelmingly supports a finding of probable cause to believe that Blair's phone would contain evidence of

a crime. The facts reflect that Blair organized and paid for the trip; that
he arranged for someone (alleged to be co-defendant Arias) to bring the
cans containing cocaine to the travelers' hotel and pack them in their
luggage on the last day of the trip; that the travelers were instructed not
to touch the "souvenirs" or leave the resort after receiving them; that
the cans in the travelers' luggage contained large amounts of cocaine;
that Blair arranged for the travelers to be picked up at the airport; that
Blair actually arrived at the airport to pick them up; and that Blair used
his cell phone to communicate with the travelers.

[*Id.*]. The last fact noted—that Blair used his cell phone to communicate with the

travelers—was not necessary to establish probable cause. Even without it, there

was sufficient evidence to believe that, more likely than not, the phone contained

evidence of a crime. Moreover, there was no evidence that the decision to apply

for the warrant was prompted by what the agents saw on the unlocked screen.

For these reasons, I will recommend that Blair's motion to suppress the

results of the search of his iPhone be denied. [7]

---

[7] Blair also complains that the agents later unlocked his iPhone and retrieved
information from it without a warrant in violation of *Riley v. California*, 573 U.S.
373 (2014). [Doc. 265 at 16]. This argument fails because the information the agents
obtained by opening the phone was not included in the search warrant affidavit and
did not cause the agents to seek a warrant. [Tr. at 33; Doc. 278-1 at 5–23].

## III.   MOTION TO SUPPRESS IDENTIFICATION

In his second motion, Blair argues that the Court should exclude Swartz's and Pearson's out-of-court identifications of him and bar them from making in-court identifications at trial.  [Doc. 265 at 17].

The standard for analyzing motions to suppress out-of-court identifications is as follows:

> Due process prohibits witnesses from testifying about out-of-court identifications when there is a very substantial likelihood of misidentification.  A violation of due process occurs when, under the totality of the circumstances, a confrontation procedure is unnecessarily suggestive and conducive to irreparable mistaken identification.   If the identification procedure was not unduly suggestive, then that ends the inquiry; the evidence may be admitted.

> If the procedures utilized were unduly suggestive, the court then considers whether, under the totality of the circumstances, the identification was nonetheless reliable.  Courts evaluate several factors to determine reliability: the opportunity of the witness to view the criminal, degree of attention, the accuracy of a prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

> The defendant bears the burden of proving that the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification, and only after the defendant meets this burden must the government show the identification was reliable independent of the suggestive procedure.

*United States v. Mustafa*, No. 1:11-cr-0234-1-CAP, 2012 WL 1903255, at *1–2 (N.D. Ga. May 25, 2012) (internal citations and quotation marks omitted).

The Government concedes that the single-photograph procedure was suggestive, but argues that it was not ***unnecessarily*** suggestive, pointing out the exigencies of the situation.  [Doc. 278 at 23–24].  I need not determine whether or not it was necessary to employ the procedure because it is clear that given the totality of the circumstances, the identifications were reliable, despite their suggestive nature.  *See Manson v. Brathwaite*, 432 U.S. 98, 114–16 (1977) (noting that when a procedure is unnecessarily suggestive but the identification is otherwise reliable, the evidence should not be excluded because the defect in the procedure, *i.e.*, the suggestiveness, "goes to weight and not to substance").

In this case, both Swartz and Pearson had previously met Blair.  Swartz had met him over FaceTime, and Pearson had met him in person at a gas station shortly before her trip.  Both were able to provide details about his appearance, knew he was from the Atlanta area, and both knew his name.  [Tr. at 18–24, 37, 94].  Pearson also accurately conveyed that the identification photo was outdated because Blair no longer wore dreadlocks.  [Tr. at 37, 86].  Given the prior relationship of the witnesses to Blair, their photographic identifications of him are, by their very nature, reliable.  *See United States v. Omar*, 786 F.3d 1104, 1109–10 (8th Cir. 2015) (noting that when someone already familiar with a suspect is asked to comment on whether an image portrays the suspect, concerns about the prejudicial effect of undue suggestiveness are absent); *United States v. Carter*, No.

205CR67FTM29DNF, 2005 WL 3556050, at *1 (M.D. Fla. Dec. 28, 2005) (concluding that an identification of a defendant from a single photograph by a witness was reliable where the witness, a police officer, had made a hand-to-hand purchase of drugs from the defendant on three separate occasions and had previously spoken to the defendant on the telephone). Moreover, the witnesses identified Blair "with certainty." [Tr. at 36, 92]. And later, when Swartz was shown a six-photo array on March 13, 2018, Swartz immediately made an identification. [Tr. at 47]. These circumstances all weigh against suppression and outweigh any potential inadequacies in the identification procedures employed. Accordingly, I will recommend that Blair's motion to suppress the identifications of him by Swartz and Pearson be denied.

## IV.   MOTION TO SUPPRESS EVIDENCE FROM JUNE 10 ARREST

In his post-hearing brief, Blair argues that cell phone evidence obtained following his June 10, 2018 arrest should be excluded because (1) the agents lacked probable cause to arrest him; and (2) the agents acted unlawfully when they searched his car and seized his phone after his arrest. I will address these arguments in turn.

### A. **Probable Cause to Arrest Blair on June 10, 2018**

Blair contends that agents arrested him "based solely on his presence at the apartment and evidence they obtained from his unlawful arrest in February 2018." [Doc. 265 at 16–17]. This argument fails because, as discussed above, Blair's February 5, 2018 arrest was lawful, and there was nothing improper about the February 6 search warrant.

To recap, by the time of Blair's June arrest, the agents had significant knowledge about his apparent involvement in the drug-trafficking conspiracy. For example, with respect to Rosa's drugs, the agents knew that Blair was in communication with both Arias and Barros; that Rosa had five cans of cocaine that appeared to belong to Arias and Barros; that Rosa had exchanged in a series of messages with both Arias and Barros over the span of more than two hours and had provided Barros with her address where they could pick up the drugs; and that Blair, who was a complete stranger to Rosa, had arrived at her apartment door. The agents also had all of the evidence about Blair's involvement with the February incident with Swartz, Pearson, and Quixote. Finally, they also had evidence that Blair had arranged and paid for as many as sixty people to travel to Costa Rica. These facts and circumstances taken together created more than a reasonable belief that Blair had committed or was committing a crime at the time he arrived on Rosa's doorstep,

and, therefore, constituted probable cause for Blair's arrest.  *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).

## B. <u>The Seizure of Blair's iPhone Without a Warrant</u>

Finally, Blair complains about the agents' seizure of his phone after his arrest. He argues first that the agents identified his vehicle by violating his *Miranda* rights when they asked him which car belonged to him before he was read his rights. Second, he argues that it was not foreseeable that there would be evidence of a crime in the car. [Doc. 265 at 17].  The remedy he seeks is suppression of all evidence obtained from that phone.  [*Id.*].

With respect to the alleged *Miranda* violation, the Government does not dispute that the questioning of Blair about his car occurred before he had been read his rights.  The Government argues, however, that the inevitable discovery doctrine (which is an exception to the exclusionary rule) saves the evidence from suppression. That doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source.  *See Utah v. Strieff*, ___ U.S. ___, 136 S. Ct. 2056, 2061 (2016).  At the hearing, Special Agent Rutherford was asked what he would have done if Blair had not identified his vehicle, and he answered, "I would have taken his keys out of his pocket and hit the unlock button or lock button and his vehicle lights would have gone off."  [Tr. at 58].  I find this

26

testimony credible and persuasive and conclude that even if Blair had not identified his vehicle, the agents would have figured it out on their own.

In his second argument, Blair relies upon the decision in *Arizona v. Gant*, 556 U.S. 332 (2009), in which the Supreme Court held that in order for the police to lawfully search a vehicle incident to a recent occupant's arrest, it must be reasonable to believe that the vehicle contains evidence of the offense of arrest. *See id.* at 351. Blair argues that it was not reasonable to believe that his car contained any such evidence. I disagree. There was ample evidence that Blair was involved in the plan to obtain the drugs from Rosa and that he had used his phone to find her apartment. There had been extensive phone conversations between Rosa, Arias, and Barros. Rosa had used her phone to give Barros her address shortly before Blair—a person who Rosa did not know—arrived at her doorstep. Thus, it was reasonable to believe Blair had used a phone to communicate with Barros to obtain Rosa's address. And, when the agents determined that Blair did not have a phone on his person, it was reasonable to believe that there was a phone in Blair's car that contained evidence that Blair had committed or was committing a crime. *See United States v. Lisbon*, 835 F. Supp. 2d 1329, 1363 (N.D. Ga. 2011) (concluding that where officers knew that the drug-trafficking organization with which the defendant was associated used cell phones to communicate with one another as to deliveries of controlled substances, pick-up of drug proceeds, and distribution to

27

customers, it was "immediately apparent" that there was probable cause to believe that the cell phone contained evidence of the crimes for which the defendant had been indicted).

Accordingly, I conclude that no evidence should be suppressed as a result of the agents' seizure of Blair's phone from his vehicle after his June arrest. For these reasons, I will recommend that this motion to suppress be denied.

## V.    CONCLUSION

For the foregoing reasons, I **RECOMMEND** that Blair's motions to suppress evidence [Docs. 33, 44, 45] be **DENIED**.

It appearing that there are no further pretrial or discovery matters to bring before the undersigned as to this defendant, it is therefore **ORDERED** that this **CASE** be and is hereby **CERTIFIED** as ready for trial.

**SO REPORTED AND RECOMMENDED**, this 4th day of June, 2021.


CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE